**UNITED STATES of America, Appellee,**

v.

**Daniel Michael TROPIANO, Defendant–Appellant.**

**No. 741, Docket 94–1340.**

United States Court of Appeals, Second Circuit.

Argued Jan. 11, 1995.

Decided March 17, 1995.

Mark B. Gombiner, New York City (Legal Aid Society, of counsel), for defendant-appellant.

Paul T. Weinstein, Asst. U.S. Atty., Brooklyn, NY (Zachary W. Carter, U.S. Atty. for the E. Dist. of N.Y., Julie E. Katzman, Asst. U.S. Atty., of counsel), for appellee.

Before: KEARSE, McLAUGHLIN, and PARKER, Circuit Judges.

McLAUGHLIN, Circuit Judge:

Daniel Tropiano appeals from a judgment of conviction and sentence entered in the United States District Court for the Eastern District of New York (Jack B. Weinstein, *Judge*).

Tropiano possessed a stolen Cadillac and another stolen car, each having an altered vehicle identification number ("VIN"). The FBI confiscated the Cadillac and, a week later, conducted an inventory search of it. The search turned up evidence showing that (1) the VIN had been altered and (2) Tropiano was a drug dealer. Tropiano moved to suppress the evidence. The district court denied the motion. Tropiano was later convicted of possessing vehicles with altered VINs. At sentencing, upon the government's motion under U.S.S.G. § 5K2.0, the district court departed upwardly, stating reasons that related to Tropiano's recidivism.

On appeal, Tropiano argues that: (1) the evidence from the Cadillac should have been suppressed because the FBI did not conduct a valid inventory search; and (2) the district court should have imposed the upward departure under U.S.S.G. § 4A1.3, rather than § 5K2.0, since the reasons the district court gave concerned the inadequacy of Tropiano's criminal history category.

Because Tropiano has no standing to object to the search, we affirm the district court's denial of his suppression motion. But, because the district court improperly imposed a 4A1.3 departure in the trappings of a 5K2.0 departure, and because we find no factual basis in the record for a 5K2.0 departure, we vacate his sentence and remand for resentencing.

## BACKGROUND

### A. *The Search and Seizure*

An informant tipped FBI agents that Tropiano was running an automobile theft business. According to the informant, Tropiano arranged for cars to be stolen, and then altered their VINs. The agents obtained a search warrant for two premises that Tropiano leased, one a garage, the other a backyard and driveway. In the garage, they found a Cadillac with an altered VIN, which they towed to an FBI garage. At the second site, agents found another car with an altered VIN. Both cars had been stolen.

A week after the Cadillac's seizure, agents opened its locked trunk with a crowbar. Inside, they found the original motor vehicle titles to two other cars; their VINs were the numbers used on the Cadillac and the other stolen car. The agents also found records reflecting a number of cocaine sales, and several items common to street level cocaine dealers: a digital scale, a calculator, a grinder, assorted plastic envelopes, and boric acid and lydocade hypochloride (the usual cutting agents for cocaine). They also found a semiautomatic pistol and ammunition.

### B. *The Suppression Motion and Trial*

Tropiano was charged with altering VINs, in violation of 18 U.S.C. § 511(a), and being a felon in possession of a firearm, in violation

of 18 U.S.C. § 922(g)(1). He moved to suppress the evidence seized from the trunk of the Cadillac, contending that there was no warrant to search the Cadillac and that a purported inventory search was invalid because the FBI did not conduct it under a standardized procedure. The district court denied the motion to suppress, ruling from the bench that the search was "part of the routine of the FBI, and the delay was due to the burden of other matters. They came to it as soon as they could."

At Tropiano's trial, the government relied heavily on the evidence from the trunk of the Cadillac. In addition, one of the government's witnesses, Philip Stines, testified that he obtained the Cadillac from Tropiano, who told him it had been stolen. Acting under Tropiano's instructions, Stines insured the Cadillac, gave it back to Tropiano, reported it stolen, and collected the insurance proceeds. Stines gave $1,000 of the proceeds to Tropiano.

### C. The Presentence Report

Tropiano was convicted of the VIN count but acquitted of the gun possession count. His presentence report ("PSR") assigned a base offense level of eight, under U.S.S.G. § 2B6.1. It bumped that up six levels under U.S.S.G. §§ 2B6.1(b)(1) and 2F1.1(b)(1)(G), because the total loss was over $80,000, and two more levels under U.S.S.G. § 2B6.1(b)(2), because Tropiano was in the business of receiving stolen property.

Next, the PSR placed Tropiano in Criminal History Category III, on the basis of a 1985 petty larceny conviction and a 1986 cocaine possession conviction. These convictions gave him four criminal history points. (Since 1986, Tropiano had no other convictions, although he was arrested for drunk driving.)

The resulting sentencing range was 27–33 months. The PSR added, however, that the court might wish to depart upward on the basis of the evidence of drug trafficking found in the Cadillac's trunk.

### D. The Fatico Hearing

The government accepted the PSR's invitation and moved for an upward departure under U.S.S.G. § 5K2.0 on the basis of uncharged conduct—Tropiano's drug trafficking. The district court conducted a Fatico hearing to determine if there was enough evidence to support the departure. See United States v. Fatico, 579 F.2d 707 (2d Cir.1978), cert. denied, 444 U.S. 1073, 100 S.Ct. 1018, 62 L.Ed.2d 755 (1980). At the hearing, three witnesses testified for the government.

First, Stines testified that he regularly purchased cocaine from Tropiano. Stines also testified that the $1,000 he gave to Tropiano after the insurance scam was to settle a cocaine debt he owed Tropiano. In addition, Stines described how Tropiano ground up cocaine and put it in plastic bags for sale. Stines also identified the scale seized from the Cadillac's trunk as the type he had seen Tropiano use. Stines' testimony was buttressed by records in the Cadillac revealing many sales to someone named "Phil," presumably, Stines.

Next, an FBI agent, Pedro Ruiz, testified that the scale, calculator, plastic envelopes, grinder, and cutting agents found in the Cadillac's trunk were the tools of the trade of street level cocaine dealers. He further testified that the records found in the Cadillac's trunk reflected the sale of over a kilogram of cocaine over a several year period.

Finally, another FBI agent, Martin Finn, testified about a stolen and retagged van recovered during the investigation of Tropiano. Finn recounted his interview with one of Tropiano's associates, Salvatore Marchese, who admitted to registering the stolen van for Tropiano in exchange for a $300 reduction of his cocaine debt to Tropiano. (A title to the van, in Marchese's name, was recovered from the Cadillac, and Marchese's name appeared in the drug records.) Finn also testified that the total value of the vehicles recovered during the investigation of Tropiano was at least $42,900.

### E. The Sentencing

At the conclusion of the Fatico hearing, the district court ruled that the total loss involved in the offense was at least $42,900, rather than the $80,000 reflected in the PSR. Accordingly, it lowered Tropiano's adjusted

offense level to fifteen, resulting in a guideline range of 24–30 months. The district court also held that because Tropiano had been acquitted of gun possession, it would not consider the weapon seized from the Cadillac in determining the sentence.

Next, the district court found that Tropiano "was involved in a whole series of narcotics transactions" and that "[t]he car deals were part of these transactions." It concluded that Tropiano needed to be incarcerated to prevent him from committing more crimes. The court noted:

> The Defendant is a confirmed recidivist. He's 25 years old, he's at the peak of his criminal career, and he has to be sentenced primarily for incapacitation because the Court is convinced that he will continue with serious criminal conduct when he's out of prison.

Without further explanation (and without stating whether it was departing under § 5K2.0, for aggravating circumstances, or under § 4A1.3, for criminal history), the district court increased Tropiano's offense level from fifteen to twenty-two, raising the sentencing range to 51–63 months. The district court then sentenced Tropiano to 60 months' imprisonment, the statutory maximum. The district court added three years' supervised release and a $50,000 fine.

The district court rejected Tropiano's application for bail pending appeal. It explained:

> Based on [Tropiano's] prior conduct, my observation of him throughout the trial, his lack of contrition, his continuing activities even after arrest ..., I believe he's a confirmed recidivist, and as I said he's at the height of his criminal powers and will be engaged in criminal conduct.
>
> . . . .
>
> ... I believe that he will continue to be a danger to the community until his energy as a criminal decreases. That normally begins to decrease after the age of 25. A person like this continues to be a danger, serious danger up to about the age of 40.
>
> So, if I could have sentenced him to ten years, I would have sentenced him to ten

years. Because I think that incarcerating him until he's in his late thirties would provide sufficient protection.
>
> He's now 27. That will mean that he's released at about age 31. Thirty-one and a half.
>
> Sorry, I can't do anything more for him. He's a vicious and arrogant criminal, in my opinion.

The district court summed up by saying:

> [Tropiano] was engaged in substantive narcotics sales, he was engaged in [the] remarking of these vehicles, he was engaged in extensive use of false documents. This man is a confirmed criminal.

Tropiano now appeals.

## DISCUSSION

### I. *The Suppression Motion*

Tropiano argues that the evidence found during the search of the Cadillac's trunk should have been suppressed. We hold that he has no standing to raise this claim.

Although the standing issue was not raised below (the district court denied the suppression motion on the merits), we may affirm the denial of the suppression motion "on any basis for which there is a record sufficient to permit conclusions of law, including grounds upon which the district court did not rely." *United States v. White,* 980 F.2d 836, 842 (2d Cir.1992).

Generally, to have standing to contest a search, a defendant must have a legitimate expectation of privacy in the thing that was searched. *See Rawlings v. Kentucky,* 448 U.S. 98, 104–06, 100 S.Ct. 2556, 2561–62, 65 L.Ed.2d 633 (1980); *Rakas v. Illinois,* 439 U.S. 128, 142–43, 99 S.Ct. 421, 430, 58 L.Ed.2d 387 (1978). Although we have not had occasion to hold so until now, we think it obvious that a defendant who knowingly possesses a stolen car has no legitimate expectation of privacy in the car. *See United States v. Betancur,* 24 F.3d 73, 76–77 (10th Cir. 1994) (to have standing to contest a search of a vehicle, defendant must prove that he was in lawful possession of the vehicle); *United States v. Lanford,* 838 F.2d 1351, 1353 (5th Cir.1988) (the possessor of a stolen vehicle

has no standing to object to its search); *United States v. Hensel*, 672 F.2d 578, 579 (6th Cir.) (per curiam) (same), *cert. denied*, 457 U.S. 1107, 102 S.Ct. 2907, 73 L.Ed.2d 1316 (1982); *United States v. Hargrove*, 647 F.2d 411, 413 (4th Cir.1981) (same).

■ Tropiano was convicted of retagging a stolen Cadillac. There is no dispute that he knew the Cadillac was stolen. Accordingly, Tropiano had no legitimate basis for possessing the Cadillac, and cannot now claim that he had a reasonable expectation of privacy in it.

Because Tropiano has no standing to object to the search of the Cadillac, we affirm the denial of his suppression motion.

## II. *The Sentencing*

Tropiano argues that the purported offense level departure was in truth a procedurally defective criminal history departure. We agree.

### A. *Reviewing Departures Generally*

■ A court may depart from the Sentencing Guidelines if it determines "that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission." 18 U.S.C. § 3553(b). We will vacate a sentence and remand for resentencing if the district court fails to follow the procedures for making such a departure. *See, e.g., Burns v. United States*, 501 U.S. 129, 139–40, 111 S.Ct. 2182, 2188, 115 L.Ed.2d 123 (1991) (vacating sentence because district court did not give advance notice of its desire to depart on a ground not mentioned in the defendant's PSR or in a presentence hearing submission by the government).

■ When reviewing a departure from the Guidelines, we first determine, *de novo*, whether the reasons articulated by the district court for the departure are of a kind or a degree that may be appropriately relied upon to justify the departure. *See United States v. Williams*, 37 F.3d 82, 85 (2d Cir. 1994); *United States v. Fadayini*, 28 F.3d 1236, 1241 (D.C.Cir.1994). We then determine whether the findings of fact supporting

the district court's reasoning are clearly erroneous. *See Williams*, 37 F.3d at 85. Having cleared these first two hurdles, we then review whether the extent of the departure was reasonable, giving considerable deference to the district court. *See id.* That said, we will vacate a sentence and remand for resentencing because of a misapplication of the Guidelines only if we determine that the error was not harmless. *See Williams v. United States*, 503 U.S. 193, 201–05, 112 S.Ct. 1112, 1120–21, 117 L.Ed.2d 341 (1992).

### B. *Horizontal Departures Under § 4A1.3*

■ When departing horizontally under U.S.S.G. § 4A1.3 for criminal history, "the court must state its reasons both for departing and, with some specificity, for the extent of [the] departure." *United States v. Stevens*, 985 F.2d 1175, 1185 (2d Cir.1993). The court meets this requirement by proceeding sequentially from the criminal history category determined by the defendant's criminal history point score through each higher criminal history category until it settles upon a category that fits the defendant. *See id.; United States v. Jakobetz*, 955 F.2d 786, 806 (2d Cir.), *cert. denied*, —— U.S. ——, 113 S.Ct. 104, 121 L.Ed.2d 63 (1992). Along the way, the district court must pause at each category to consider whether that category adequately reflects the seriousness of the defendant's record. Only upon finding a category inadequate may the court proceed to the next category. *See United States v. Coe*, 891 F.2d 405, 412 (2d Cir.1989). Once the court finds a category that fits, it must " 'use the corresponding sentencing range for that category' " to guide the departure. *Id.* (quoting *United States v. Cervantes*, 878 F.2d 50, 53 (2d Cir.1989)); *see* U.S.S.G. § 4A1.3 ("In considering a departure under this provision, the Commission intends that the court use, as a reference, the guideline range for a defendant with a higher or lower criminal history category, as applicable.").

We have on occasion criticized this procedure as rigid and mechanistic. *See United States v. Thomas*, 6 F.3d 960, 964–65 (2d Cir.1993); *United States v. Rodriguez*, 968 F.2d 130, 140 (2d Cir.), *cert. denied*, —— U.S. ——, 113 S.Ct. 140, 121 L.Ed.2d 92 (1992).

Indeed, we have refused to require it for offense level departures, known as vertical departures, including those under U.S.S.G. § 5K2.0 for aggravating circumstances "of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines." *See United States v. Campbell,* 967 F.2d 20, 25–26 (2d Cir.1992) (involving U.S.S.G. § 2L1.2, but discussing § 5K2.0); *see also United States v. Hernandez,* 941 F.2d 133, 140–41 (2d Cir.1991) (upholding 5K2.0 departure, even though step-by-step procedure not followed). Nonetheless, a district court cannot avoid this step-by-step framework "by classifying a departure based on criminal history as [an offense level departure] involving aggravating circumstances under 5K2.0." *United States v. Deutsch,* 987 F.2d 878, 887 (2d Cir.1993).

*Deutsch* is almost squarely on point. There, "the district court failed to state the section number upon which it relied to make its upward departure." *Id.* Although the district court "gave every indication that it was making a 5K2.0 departure," it "based its departure on [the defendant's] criminal record and likelihood of recidivism." *Id.* We held that "[t]hese factors are exactly those to be considered under Section 4A1.3" when departing horizontally for criminal history, and could not form the basis for a 5K2.0 departure. *Id.*

Here, in granting the government's motion for a 5K2.0 departure, the district court emphasized that Tropiano was a "confirmed recidivist" at the "peak of his criminal career" who had to "be sentenced primarily for incapacitation." The court also announced that Tropiano had to be incarcerated for as long as the law permitted because "he will continue to be a danger to the community until his energy as a criminal decreases," and that "[a] person like this continues to be a danger, serious danger up to about the age of 40."

■ These concerns are the core concept of criminal history, and fall squarely under § 4A1.3. *See Deutsch,* 987 F.2d at 887 (concerns over recidivism and incapacitation fall under § 4A1.3, not § 5K2.0); *Coe,* 891 F.2d at 411. But, while the record reflects the district court's understandable concerns over

Tropiano's criminal history, it conspicuously lacks any reference to the detailed procedure for making horizontal departures that we outlined in *Deutsch,* 987 F.2d at 886–88, *Jakobetz,* 955 F.2d at 806, *Coe,* 891 F.2d at 412–13, and *Cervantes,* 878 F.2d at 55. Instead, the district court, in one leap, jumped vertically seven offense levels, resulting in a sentencing range that, had the district court proceeded step-by-step horizontally, would have exceeded what even a Category VI criminal history would have allowed. The district court did precisely what *Deutsch* proscribed: circumvent the strictures of a § 4A1.3 horizontal departure by treating criminal history concerns as aggravating circumstances that affect offense level under § 5K2.0. This it may not do. *See Deutsch,* 987 F.2d at 887.

We are aware that other circuits have not adopted so rigid a demarcation between 4A1.3 and 5K2.0 departures, and those circuits will affirm 5K2.0 departures based on criminal history concerns. *See, e.g., United States v. Schmeltzer,* 20 F.3d 610, 613 (5th Cir.) (affirming 5K2.0 departure based on prior convictions for a very similar offense), *cert. denied,* —— U.S. ——, 115 S.Ct. 634, 130 L.Ed.2d 540 (1994); *United States v. Nomeland,* 7 F.3d 744, 747–48 (8th Cir.1993) (affirming 5K2.0 departure based on defendant's extensive and violent criminal activity); *United States v. Molina,* 952 F.2d 514, 518–19 (D.C.Cir.1992) (similarity of offense of conviction to prior offenses permissible basis for a 5K2.0 departure). We conclude, however, that it is too late in the day in this Circuit for a panel to hold that 5K2.0 departures encompass criminal history concerns, as well.

### C. *Vertical Departures Under § 5K2.0*

■ The failure to follow the category-by-category horizontal departure procedure would not matter if the district court had stated on the record an alternative reason, other than recidivism, for reaching the same result. *See Williams,* 503 U.S. at 201–05, 112 S.Ct. at 1120–21. Recognizing this, the government strains to distinguish *Deutsch* by arguing that "[i]t is clear from the record that the court's decision to depart was based squarely on Tropiano's drug-trafficking activ-

ity." The government points to the district court's comment that it considered the evidence of Tropiano's drug trafficking, and that Tropiano's activities with the Cadillac and the van were part of his drug trafficking. The government argues, therefore, that these articulated concerns demonstrate that the district court was departing vertically, under 5K2.0, rather than horizontally, under 4A1.3. We conclude that the record simply does not justify a vertical departure based on defendant's drug trafficking.

 Section 5K2.0 allows an upward departure for misconduct not leading to conviction if the defendant committed acts " 'relate[d] in some way to the offense of conviction, even though not technically covered by the definition of relevant conduct.' " *United States v. Uccio,* 917 F.2d 80, 86 (2d Cir.1990) (quoting *United States v. Kim,* 896 F.2d 678, 684 (2d Cir.1990)). The district court, however, must support such a departure with findings of fact, *see id.,* and must explain on the record how it determined the extent of the departure. *See United States v. Mora,* 22 F.3d 409, 413 (2d Cir.1994); *Campbell,* 967 F.2d at 26–27. Finally, misconduct unrelated to the offense of conviction cannot form the basis for a 5K2.0 departure. *See Uccio,* 917 F.2d at 86; *Kim,* 896 F.2d at 684.

The relationship here between Tropiano's drug dealing and the offense of conviction—the alteration of VINs—is not intuitively obvious. Nor can we glean from the record a sufficient factual predicate for finding the crimes related.

Tropiano had his fingers in several pies. He dealt drugs, ran a car theft and retagging ring, and defrauded an automobile insurance company. Perhaps these activities were all related, with Tropiano the mastermind of a multifaceted criminal enterprise. We might then have a sufficient factual predicate for a 5K2.0 departure. But, the district court made no findings of fact that Tropiano ran such an enterprise.

We are left, then, with two possible bases on the record for the departure. First, the government argues that Tropiano's storage of his drug records and paraphernalia in the Cadillac proves that Tropiano used the Cad-

illac both to conduct and to conceal his drug dealing. But, this is sheer speculation. The district court made no findings of fact that Tropiano used the car either to conceal the records or to sell drugs. And, most of the drug trafficking evidenced by the records found in the Cadillac's trunk took place long before Tropiano retagged the Cadillac. On these facts, using the Cadillac to store evidence of drug trafficking was no more related to the offense of conviction than if Tropiano had struck a pedestrian with one of the retagged vehicles while driving drunk.

 Second, the government tries to link Tropiano's drug trafficking to the VIN offense because Tropiano, with the help of a drug customer, Stines, whose drug debt was then reduced, used the Cadillac to defraud an insurance company. We find this link too tenuous. Had Tropiano retagged the Cadillac *before* defrauding the insurance company, the fraud (and perhaps some of the drug trafficking) might support an upward departure: Tropiano would have committed one offense—altering a VIN—to aid another—insurance fraud—which in turn aided a third—drug trafficking. *See* U.S.S.G. § 5K2.9; *United States v. Figaro,* 935 F.2d 4, 6–7 (1st Cir.1991) (where offense of conviction was committed to aid another, uncharged offense, 5K2.0 departure was justified). But this is not our case. The government concedes that Tropiano altered the Cadillac's VIN only *after* defrauding the insurance company. Thus, the only link between the fraud, the drug trafficking, and the offense of conviction is that Tropiano used the Cadillac to commit all three. As our drunk driving hypothetical suggests, this alone cannot support a 5K2.0 departure.

Of course, Tropiano could have altered the Cadillac's VIN to conceal the insurance fraud. This would support a departure. *See* U.S.S.G. § 5K2.9. But the district court made no such finding. Even if the court had done so, there is still no explanation of why the fraud or the drug trafficking justified a seven-level offense level departure that almost doubled Tropiano's sentence. The court made no finding regarding the amount of cocaine Tropiano dealt as evidenced by the

drug records. Moreover, the court did not explain why *all* of that drug trafficking should be considered, rather than just that amount represented by Stines' forgiven debt. We thus cannot determine whether the extent of the departure was reasonable.

We have reviewed carefully all of the government's arguments regarding Tropiano's sentence, and conclude that they lack merit. We do not dispute that there was evidence linking Tropiano to other serious crimes. We cannot discern, however, the basis for the finding that these crimes were related to the offense of conviction. That Tropiano was involved in other crimes in addition to altering VINs does not itself support a 5K2.0 departure. Unfortunately, the record below suggests that the district court considered little more than that, coupled with criminal history concerns, in departing upward.

### CONCLUSION

Because Tropiano has no standing to object to the search of the Cadillac, his conviction must stand. The district court, however, did not comply with the procedures we have established for imposing a horizontal departure. This error was not harmless, as there is no basis for a vertical departure on the record before us. Accordingly, we vacate Tropiano's sentence and remand for resentencing.